THE O'MARA LAW FIRM, P.C.
David C. O'Mara
311 E. Liberty Street
Reno, Nevada 89501
Telephone:    (775) 323-1321
Facsimile:    (775) 323-4082

*Attorneys for Plaintiff*

[Additional counsel appears on signature page]

UNITED STATES DISTRICT COURT
DISTRICT OF NEVADA

| | |
|---|---|
| SERGIO M. JARAMILLO, on behalf of himself and all others similarly situated, | ) ) ) No. |
| Plaintiff, | ) ) **CLASS ACTION COMPLAINT** ) ) |
| vs. | ) ) ) **DEMAND FOR JURY TRIAL** |
| UNION PACIFIC RAILROAD COMPANY; SFPP, L.P. (FORMERLY KNOWN AS SANTA FE PACIFIC PIPELINES, INC.); KINDER MORGAN OPERATING L.P. "D"; AND KINDER MORGAN G.P., INC., | ) ) ) ) ) ) ) |
| Defendants. | ) ) |

CLASS ACTION COMPLAINT

Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff Sergio M. Jaramillo on behalf of himself and all others similarly situated, makes the following allegations, except as to allegations pertaining to Plaintiff, based on the investigation of his counsel, including a review of legal and regulatory filings, press releases, media reports about Defendants, relevant court decisions, and other publicly-available information about Defendants.  Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

**NATURE OF THE ACTION**

1.      Beginning in approximately 1850, Congress embarked upon a policy of subsidizing railroad construction by paying for it with lavish grants from the public domain.   These initial "Congressional Acts" granted vast areas of land to several transcontinental railroads, including to the predecessor-in-interest of Defendant Union Pacific Railroad Company, encouraging them to build tracks across the nation.  Some of the land was transferred to the railroads as their own property, to sell and finance their progress in constructing and running the railroad.  Other parts were granted as rights-of-way over the surface upon which to build tracks and related structures.

2.      While the early grants could be considered "lavish," they did have strings attached.  The railroads were not given full fee title.  The land had to be used for legitimate "railroad purposes."  If a railroad ceased to use the land for railroad purposes, it would revert to the government or its grantees.  Thus, at most, "the railroads received all *surface* rights to the right of way and all rights incident to a use *for railroad purposes*."[1]

3.      Notably, the initial Congressional Acts did not purport to convey – and did not convey – any *subsurface* rights beyond those necessary for "railroad purposes."  For example, starting with the act of 1864, *see* Act of July 2, 1864, ch. 216, § 1-22, 13 Stat. 356, the federal government expressly retained rights to the "mineral lands," with the exception

---

[1] *United States v. Union Pac. R.R. Co.*, 353 U.S. 112, 119 (1957) ("*Union Pacific Railroad*") (emphases added).

of coal and iron.

4. In 1875, Congress passed the General Right-of-Way Act, 18 Stat. 482, 43 U.S.C. § 934 *et seq.*, which provided railroads with further rights-of-way through public lands for the construction of a railroad. But now Congress made it clear that it was providing the railroads with mere "easements" over the land on which they could lay their tracks and run their trains. Railroads were given no fee interest in the property itself. Instead, the title to the property remained in the federal government or its grantees.

5. Plaintiff is an owner, in fee simple, of parcels of land that are adjacent to or crossed by a railroad corridor belonging to Defendant Union Pacific Railroad Company ("Union Pacific"). Unbeknownst to Plaintiff, beginning in the mid-1950s, Union Pacific's predecessor entered into agreements with predecessors of Defendants SFPP, L.P. ("SFPP"), Kinder Morgan Operating, L.P. "D" ("Kinder Morgan D"), and Kinder Morgan G.P., Inc. ("Kinder Morgan GP"), whereby Union Pacific's predecessor granted easements to those companies in the subsurface underlying the railroad's right-of-way in order for those companies to run their pipelines, which carried oil, gas, and other petroleum products across the western United States.

6. Union Pacific's predecessor granted the aforementioned easements despite knowledge that it might not have had sufficient property interest to do so. For example, in one 1974 letter, an in-house attorney for Union Pacific's predecessor wrote regarding a proposed pipeline easement in Contra Costa County, California saying, "[n]o assurance can be given Railroad is entitled to grant the pipeline easement in view of the unfavorable trend of California decisions interpreting grants to railroad companies." Another letter by the same in-house attorney written in 1976 discussed the fact that upon abandonment of rail operations, the limited title properties may result in reversion of title, and that the easements are subject to loss upon abandonment for railroad purposes. The letter concluded that "consideration need be given as to the advisability of granting to [the pipeline companies] an easement for pipelines in the property classified as limited title and easement for railroad purposes … unless it is feasible for Railroad to take steps necessary

to establish that it is the fee owner of the right of way in which [the] pipeline is located." Despite the foregoing concerns, Union Pacific's predecessor continued to grant easements to the pipeline companies.

7.     Plaintiff brings this action on behalf of himself and all other similarly-situated landowners in Nevada who own, in fee simple, land adjacent to and underlying the railroad easement under which the pipeline is located.  Plaintiff seeks a declaration that (1) Union Pacific lacks sufficient legal right or title in the subsurface of its right-of-way to grant easements or to collect rents associated with the occupancy of the subsurface, and (2) SFPP, Kinder Morgan D, and Kinder Morgan GP lack sufficient legal right or title to occupy the subsurface of the railroad's right-of-way.  Plaintiff also seeks to quiet title in the subsurface real property in Plaintiff's and the Class members' respective names, free and clear of any claimed interest by Defendants.  Due to Defendants' unlawful and unfair use of – and profit from – Plaintiff's and the Class members' subsurface rights, Plaintiff further seeks an award of damages, restitution, and/or disgorgement of benefits or profits received by Union Pacific and for a constructive trust in favor of Plaintiff to be placed upon the benefits and proceeds received by the Defendants.

## JURISDICTION AND VENUE

8.     Jurisdiction is proper under 28 U.S.C. § 1332(a) because there is complete diversity between Plaintiff and defendants, and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

9.     Jurisdiction is also proper under 28 U.S.C. § 1332(d) because this is a class action in which the amount in controversy exceeds the sum of $5,000,000, exclusive of interest and costs, and at least one member of the proposed class is a citizen of a state different from at least one defendant.

10.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because (a) a substantial part of the events giving rise to this dispute occurred in this District; and (b) Defendants do business in the State of Nevada and in this District and are subject to personal jurisdiction in the State of Nevada.  Defendants therefore reside in this District

3

CLASS ACTION COMPLAINT

1    for venue purposes pursuant to 28 U.S.C. § 1391(c)(2).

2        11.    The real property which forms the subject matter of this action is located in

3 the State of Nevada.

4        12.    The conduct complained of herein occurred, in whole or in part, within the

5 State of Nevada and/or was directed at residents and citizens of the State of Nevada.

6 **PARTIES**

7        13.    Plaintiff Sergio M. Jaramillo is an individual resident and citizen of the State

8 of Nevada, and is the owner in fee simple of a parcel of land located in Washoe County,

9 Nevada, assessor parcel number 012-052-19. The parcel of land is adjacent to or crossed by

10 a railroad corridor.  One or more of Defendants entered upon that land, excavated it, and

11 constructed a pipeline across the northern side of Plaintiff's parcel in a westerly direction,

12 beginning at Interstate 580 to and ending at North Wells Avenue in Reno, Nevada, that

13 runs below ground, beneath the railroad's right-of-way.

14        14.    Defendant Union Pacific, successor to Southern Pacific Transportation

15 Company, is a Delaware Corporation with its principal place of business in Omaha,

16 Nebraska.

17        15.    Defendant SFPP, formerly known as Santa Fe Pacific Pipelines, Inc., is a

18 limited partnership.  Upon information and belief, the partners of SFPP are citizens of the

19 States of Texas and/or Delaware.

20        16.    Defendant Kinder Morgan D is a Delaware limited partnership.   Upon

21 information and belief, the partners of Kinder Morgan D are citizens of the States of Texas

22 and/or Delaware.

23        17.    Defendant Kinder Morgan GP, is a corporation.  Kinder Morgan GP is

24 incorporated in the State of Delaware and maintains its principal place of business in the

25 State of Texas.

26        18.    Defendants SFPP, Kinder Morgan D, and Kinder Morgan GP are

27 collectively referred to as the "Pipeline Entities."

28

4
CLASS ACTION COMPLAINT

# FACTUAL ALLEGATIONS

## I.      Congress Grants Rights-of-Way to Railroads in the 19th Century

19.     Beginning in approximately 1850, Congress embarked upon a policy of subsidizing railroad construction by paying for it with large land grants from the public domain.

20.     President Abraham Lincoln signed the Pacific Railroad Act on July 1, 1862, *see* Railroad Act of 1862, ch. 120, §§ 1–20, 12 Stat. 489, and subsequent acts were signed by him and his successors.  *See* Act of July 2, 1864, ch. 216, §§ 1–22, 13 Stat. 356; 30 U.S.C. § 21; General Right-of-Way Act of 1875, 18 Stat. 482, 43 U.S.C. § 934 *et seq.*

21.     These Congressional Acts granted vast areas of land to several transcontinental railroads, including Union Pacific, encouraging them to build tracks across the nation.

22.     Some of the land was transferred directly to the railroads as railroad property, to sell and finance their progress.

23.     Other parts of the land were granted as rights-of-way over the surface upon which to build tracks and related structures.

24.     In the same year that he signed the Pacific Railroad Act of 1862, President Lincoln signed the Homestead Act, *see* Ch. 75 §§ 1–8, 12 Stat. 392, which granted large swaths of land to settlers, who owned and developed the land near, and with the help of, the railroads.

25.     Railroads also obtained easements from private individuals for use and access to private lands that were subject to the restriction that the land be used solely for railroad purposes.  Such private easements also only granted surface rights to the railroads.

26.     In 1864, in the second major railroad act, the government amended the Pacific Railroad Act of 1862, reiterating that the government retained rights to the "mineral lands," with the exception of coal and iron.  *See* Act of July 2, 1864, ch. 216, § 1–22, 13 Stat. 356.  In 1866, Congress passed a law providing that "[i]n all cases lands valuable for minerals shall be reserved from sale, except as otherwise expressly dictated by law."  30

CLASS ACTION COMPLAINT

1    U.S.C. § 21.

2         27.     In 1875, Congress passed the General Right-of-Way Act of 1875, 18 Stat.

3 482, 43 U.S.C. § 934 *et seq.*, granting the railroads additional rights-of-way, but clarifying

4 that the government was providing the railroads with mere "easements" over the land on

5 which they could lay their tracks and run their trains, but that title remained in the federal

6 government.

7         28.     With the advent of the internal combustion engine, the need for railroads

8 diminished and the railroads sold, abandoned, or discontinued much of their tracks.

9         29.     In response, Congress enacted laws governing the disposition of abandoned

10 or forfeited railroad rights-of-way, which provided that any transfer would "be subject to

11 and contain reservations in favor of the United States of all oil, gas, and other materials in

12 the land." 43 U.S.C. § 912. When pipelines appeared on the scene, carrying oil, gas, and

13 other fuels, Congress passed laws governing subsurface oil and gas pipelines through

14 federal lands, providing for annual rental payments to the government. *See, e.g.*, 30 U.S.C. §

15 185 *et seq.* Congress also passed a law providing that the government could grant leases for

16 oil and gas deposits "in or under lands embraced in railroad or other rights of way acquired

17 under any law of the United States, whether the same be a base fee or mere easement." 30

18 U.S.C. § 301 *et seq.*

19 **II.**      **The Limited Scope of Rights Granted to the Railroads by Congress**

20         30.     The Congressional land acts and easements by private grant only granted the

21 railroads surface easements for railroad purposes, and expressly reserved and did not

22 convey rights to the subsurface real property that is below the railroad's right-of-way.

23         31.     For example, while the pre-1871 Congressional grants were generous they

24 did have strings attached. The railroads were not given full fee simple title. The land had

25 to be used for legitimate "railroad purposes." If a railroad ceased to use the land for

26 railroad purposes, it would revert to the government or its grantees. Thus, at most, "the

27

28

railroads received all *surface* rights to the right of way and all rights incident to a use *for railroad purposes*."[2]

32.     Notably, the initial Congressional Acts did not purport to convey — and did not convey — any *subsurface* rights beyond those necessary for "railroad purposes."  For example, starting with the act of 1864, *see* Act of July 2, 1864, ch. 216, § 1–22, 13 Stat. 356, the federal government expressly retained rights to the "mineral lands," with the exception of coal and iron.  Thus, the railroads had the right to extract from the subsurface only such minerals as were necessary for the construction and operation of the railroads.

33.     In 1875, Congress passed the General Right-of-Way Act, 18 Stat. 482, 43 U.S.C. § 934 *et seq.*, which provided railroads with further rights-of-way through public lands for the construction of a railroad.  But now Congress made it clear that it was providing the railroads with mere "easements" over the land on which they could lay their tracks and run their trains.  Railroads were given no fee simple interest in the property itself.  Instead, the title to the property remained in the federal government or its grantees, if any.  Railroads were also given the right to use the subsurface only as necessary to support the surface operations of the railroads.

## III.     Pipeline Easements Granted by Union Pacific's Predecessor

34.     Union Pacific currently operates a railroad transportation system in 23 states west of the Mississippi River totaling roughly 32,400 miles, including within the State of Nevada.

35.     Approximately half of Union Pacific's railroad tracks in the western part of the United States, including within Nevada, were obtained by and through one of the Congressional land grants.  The remainder of Union Pacific's tracks in the western part of the United States, including within Nevada, were obtained by purchase or by easements through private grants.

---

[2] *Union Pacific Railroad*, 353 U.S. at 119 (emphases added).

CLASS ACTION COMPLAINT

36.     In the mid-1950s, Union Pacific's predecessor and the Pipeline Entities' predecessor were sister subsidiaries of Southern Pacific Corporation.

37.     Union Pacific's predecessor possessed a valuable transportation corridor along the rights-of-way granted to it initially by acts of Congress.  The Pipeline Entities' predecessor wished to obtain an easement through which to run its pipelines, which carried petroleum products.  To accomplish this, the two sister companies entered into master agreements in 1955 and 1956, wherein Union Pacific's predecessor rented portions of the subsurface under its rights-of-way, in Western states, including within Nevada, to the Pipeline Entities' predecessor.

38.     In the 1950s, the Pipeline Entities' predecessor began constructing oil and gas pipelines to run below ground, beneath the railroad's right-of-way.

39.     The Pipeline Entities now own approximately 1,871 miles of pipeline running through California, Arizona, Nevada, New Mexico, Texas, and Oregon within Union Pacific's right-of way.  Another 1,400 miles run through public and private lands. The system distributes refined petroleum products (principally diesel, all grades of gasoline, and jet fuel). Kinder Morgan's SFPP system includes, among other things, the East Line which is approximately 400 miles of pipeline originating in El Paso, Texas transporting products to Tucson and Phoenix, Arizona.

40.     Union Pacific's predecessor granted the aforementioned easements — and the Pipeline Entities' predecessor accepted the same — despite significant controversy as to whether Union Pacific's predecessor had any right to convey the subject easements.

41.     In 1957, the Supreme Court of the United States issued its seminal opinion in *Union Pacific Railroad*, 353 U.S. at 112.  There, the federal government sued the Union Pacific Railroad Company, seeking to enjoin it from extracting oil and gas from the subsurface under a pre-1871 right-of-way.  The Supreme Court sided with the federal government, holding that while under the pre-1871 Acts a railroad was entitled to full use of the surface of the land, it could only use the subsurface "'for railroad purposes.'"  *Id.* at 114 & n.1.  The Supreme Court held that because the extraction of minerals from the

1  subsurface was not a railroad purpose, and was expressly reserved in the statute, the pre-
2  1871 Acts did not provide the railroad with the right to do so.

3      42.    Even Union Pacific's in-house counsel questioned the ability of the railroad
4  to grant easements to the pipeline companies.  For example, in one 1973 letter, an in-house
5  attorney for Union Pacific's predecessor acknowledged that recent federal court decisions
6  bearing on "the extent of the rights granted to Railroad under the March 3, 1871 Act now
7  appear to be more restrictive as to use of the right-of-way for other than railroad purposes"
8  than previously believed.  In a similar 1974 letter, the attorney wrote regarding a proposed
9  pipeline easement in Contra Costa County, California saying, "[n]o assurance can be given
10 Railroad is entitled to grant the pipeline easement in view of the unfavorable trend of
11 California decisions interpreting grants to railroad companies."  Another letter by the same
12 in-house attorney written in 1976 discussed the fact that upon abandonment of rail
13 operations, the limited title properties may result in reversion of title, and that the
14 easements are subject to loss upon abandonment for railroad purposes.   The letter
15 concluded that "consideration need be given as to the advisability of granting to [the
16 Pipeline Entities] an easement for pipelines in the property classified as limited title and
17 easement for railroad purposes … unless it is feasible for Railroad to take steps necessary
18 to establish that it is the fee owner of the right of way in which [the] pipeline is located."

19     43.    Despite the foregoing concerns, Union Pacific's predecessor continued to
20 grant easements to the Pipeline Entities' predecessor to construct an underground pipeline
21 within the subsurface underlying the railroad's right-of-way.

22     44.    The pipelines were built underneath the railroad's rights-of-way irrespective
23 of what ownership interest the railroad had actually acquired in this subsurface real
24 property pursuant to pre-1871 Acts of Congress or the 1875 Act, and irrespective of the
25 fact that the railroad only acquired a surface easement for its railroad purposes and had no
26 legal rights to occupy the subsurface or to grant subsurface easements for purposes of
27 constructing or operating the pipeline.

28     45.    In 1983, Union Pacific's predecessor and the Pipeline Entities' predecessor

9

CLASS ACTION COMPLAINT

entered into a new master agreement addressing the easements. The new master agreement revised the arrangement regarding the Pipeline Entities' perpetual, nonexclusive easements, and it set forth the amount of rent to be paid for existing pipeline easements through 1993.

46.     Also in 1983, Southern Pacific, the parent company of Union Pacific's predecessor and the Pipeline Entities' predecessor, announced a merger with Santa Fe Railroad.

47.     Ultimately, the Interstate Commerce Commission disapproved of the consolidation of the two railroads and required Union Pacific's predecessor to be sold to a third party resulting in Union Pacific and the Pipeline Entities no longer being sister subsidiaries.

48.     In 1991, Union Pacific's predecessor sued the predecessor of the Pipeline Entities, alleging that the 1983 agreement should be rescinded because it was created while the companies were still sister entities and because it was not negotiated at arm's length, meaning that an artificially-low rent amount was established for the Pipeline Entities' easements.

49.     The 1991 lawsuit was settled in April of 1994 by virtue of a settlement agreement, which provided that the 1983 easement rental agreement was rescinded, the purported pipeline easement rights were confirmed, the parties compromised various existing claims, and the Pipeline Entities' predecessor paid over $5 million in return for dismissal of claims and causes of action.

50.     In July of 1994, Union Pacific's predecessor and the Pipeline Entities' predecessor entered into an amended and restated easement agreement ("AREA"), which purported to state that Union Pacific's predecessor granted easements to the Pipeline Entities' predecessor for the transportation of its petroleum, natural gas, and other products, and reiterated a procedure and mechanism to determine the amount of rent that the Pipeline Entities' predecessor would pay to Union Pacific's predecessor for what purported to be perpetual easements in the subsurface of the right-of-way.

51. The next stage of litigation between Union Pacific and the Pipeline Entities commenced in 2004. In April of 2012, after more than 250 trial days, a trial court in Los Angeles, California found that pursuant to the AREA, the base annual rent owed from the Pipeline Entities to Union Pacific commencing on January 1, 2004 was $14,080,487.00; that back rent due as of the time of the judgment was $81,589,584.00; and that pre-judgment interest was payable by the Pipeline Entities to Union Pacific in the amount of $19,372,195.50.

52. The Pipeline Entities appealed the judgment. On November 5, 2014, the California Court of Appeal for the Second District affirmed in part and reversed in part and remanded. *See Union Pac. R.R. Co. v. Santa Fe Pac. Pipelines, Inc.*, 231 Cal. App. 4th 134 (2014) ("*Santa Fe Pacific*").

53. The California Court of Appeal held that the pre-1871 and 1875 Congressional Acts did not, by themselves, convey a sufficient property interest to Union Pacific's predecessor to justify its collecting rent on the Pipeline Entities' subsurface easements.

54. Because the Congressional acts alone did not provide Union Pacific with sufficient property rights to rent the subsurface to the Pipeline Entities, the Court of Appeal held that in some instances Union Pacific was seeking to collect rent for the use of property owned by others — either private third parties or the federal government (or its grantees).

**IV.   The Easements Granted by Union Pacific Were Unlawful and Unfair**

55. The original Congressional grants expressly described their purpose as granting the lands and/or rights-of-way to the railroads for "railroad purposes" only. For example, the original Pacific Railroad Act of 1862 was passed "to lay out, locate, construct, furnish, maintain, and enjoy a continuous railroad and telegraph, with the appurtenances" and to "aid[ ] in the construction of [the] railroad and telegraph line." Ch. 120, §§ 1, 3, 12 Stats. 489. The Act of July 2, 1864 was meant for the "construction and working of said road." Ch. 216, § 3, 13 Stats. 356. And the Act of July 25, 1866 required the railroad

companies "to operate and use the portions or parts of said railroad and telegraph … for all purposes of transportation, travel, and communication, so far as the government and public are concerned."  Ch. 242, § 7, 14 Stats. 239.

56.     The easements granted by Union Pacific's predecessor to the Pipeline Entities' predecessor for construction of pipelines to carry petroleum products are clearly not for "railroad purposes."  For something to be a railroad purpose, it must at least be used to construct and operate a railroad or to be used for such purpose as is necessary and incident to railroad construction, maintenance, and operation.  A subsurface petroleum pipeline serves none of these purposes.  Rather, in the words of the California Court of Appeal, "a subsurface petroleum pipeline is clearly an 'abnormal development' *not* encompassed by the original [Congressional] grant, which increases the burden on the servient tenement."  *Santa Fe Pacific*, 231 Cal. App. 4th at 164 (emphasis added).  Indeed, "one would have to engage in a terrible distortion of law and logic to find that somehow the railroad, not the government or its grantees, obtained the rights to the subsurface underneath its rights-of-way to do with it as it saw fit — especially when a railroad purpose must be something that furthers the goal of the legislative enactment, not something that merely serves the economic interests of a private company."  *Id.* at 174.

57.     In sum, "[t]here is nothing in the statutory language, nor its content or context that remotely suggests that Congress meant to give the railroads the right to use the land under their rights-of-way to generate revenue for themselves."  *Id.* at 175.

58.     Union Pacific's use of — or its grant of easements to the Pipeline Entities for the use of — the right-of-way that was limited to railroad purposes to carry petroleum through a subsurface pipe was an improper and illegal use outside the scope of Union Pacific's easement, which terminated Union Pacific's easement.  The Pipeline Entities' use of the subsurface of the right-of-way to convey petroleum products may be severed from the surface railroad use and terminated.

59.     Plaintiff and Class Members are fee owners of the real property that runs adjacent to, or is crossed by, a railroad corridor, owned by the Railroad and fee owners of

the real property beneath the Railroad's right-of-way to the center line of the right-of-way, including land within which the Pipeline was installed.

60. The Railroad and Pipeline did not obtain an easement or other right to use the subsurface of the Plaintiff's or Class Members' land.

61. The purported easement agreements granted by Union Pacific's predecessor to the Pipeline Entities' predecessor were and are invalid. As a result, Defendants have been trespassing on Plaintiff's fee ownership in the subsurface of the right-of-way for over 50 years without payment to all of the adjacent landowners who own the fee in the right-of-way.

62. Plaintiff is a successor in title to what were once public lands through which the Railroad rights-of-way now pass, or, alternatively, is a fee owner of property that is burdened by a surface easement for railroad purposes only.

63. Defendants have been unjustly enriched for over 50 years by, in Union Pacific's case, collecting rent from the Pipeline Entities that it had no right to collect, and, in the Pipeline Entities' case, by developing a commanding share of the oil and gas market through the use and occupancy of the pipeline without the consent of Plaintiff and the Class and without compensation to them.

64. Upon information and belief, the Pipeline Entities received a very favorable price from Union Pacific because Union Pacific knew that it did not have the right to grant easements to construct an underground pipeline within the subsurface underlying the railroad's right-of-way.

65. Defendants' wrongful conduct is ongoing and continuing, and has caused and continues to this day to cause harm to Plaintiff and the Class.

66. Upon information and belief, as early as the 1950s, Union Pacific's predecessor-in-interest recognized that it did not have sufficient legal title to purportedly grant an easement within the subsurface of the railroad's right-of-way to construct and operate an oil and gas pipeline.

67. Upon information and belief, employees, agents, or representatives of Union

CLASS ACTION COMPLAINT

Pacific's predecessor-in-interest recommended that the company justly compensate the true fee owners of the subsurface — *i.e.*, Plaintiff and the Class members — which Union Pacific's predecessor-in-interest wrongfully failed and refused to do.

68.     Upon information and belief, Union Pacific's predecessor knowingly engaged in a plan, conspiracy, and scheme with the Pipeline Entities to unlawfully deprive Plaintiff and the Class members of their property rights by granting the right to construct an oil and gas line within the subsurface of the railroad's right-of-way in excess of the railroad's legal rights and without due notice or compensation to Plaintiff and the Class members for such use and occupancy.

69.     Upon information and belief, the Pipeline Entities have recognized for decades that Union Pacific lacked sufficient title to convey easements to the Pipeline Entities in tracts of land that were granted to Union Pacific pursuant to Congressional Acts, but have knowingly and deliberately conspired with the other Defendants to transmit petroleum products through Plaintiff's and the Class members' real property and withhold rents from the lawful owners of the subsurface that they wrongfully used and/or occupied.

70.     Defendants are legally sophisticated entities that thoroughly researched, investigated, and assessed the nature of their purported legal rights and claims to the subsurface of the railroad's rights-of-way, and, upon information and belief, knew that they had no legal right to use, occupy, or profit from the subsurface real property that is owned by Plaintiff.

71.     Defendants, at all times relevant hereto, misrepresented and/or concealed from Plaintiff the facts regarding the presence of the pipeline on Plaintiff's real property and the nature of Defendants' supposed legal rights to use, occupy, or profit from the subsurface of the railroad's rights-of-way.

72.     Plaintiff was wrongfully deterred from filing his causes of action against Defendants by virtue of Defendants' wrongful conduct in concealing the true facts and wrongfully and dishonestly misleading Plaintiff as to the nature of Plaintiff's rights, despite Defendants' knowledge that they had no right to occupy the subsurface of Plaintiff's real

property.

73.     The pipeline was constructed underground, in some cases 40 to 60 feet below the surface.

74.     Defendants' use and occupancy of the subsurface of the railroad's rights-of-way was hidden or concealed from Plaintiff.

75.     Either the construction of the pipeline was not visible to Plaintiff and the Class members at the time it was constructed, or it was not visually apparent to Plaintiff and the Class members that the pipeline was for the purpose of conveying petroleum products for the commercial gain of Defendants as opposed to being for the structural or drainage needs of the railroad attendant upon legitimate railroad operations.

76.     Prior to the California Court of Appeal's decision, Plaintiff did not discover, and did not know of, the facts that would have caused a reasonable person to suspect that they had suffered harm and that such harm was caused by Defendants' wrongful conduct.

**CONSPIRACY AND CONCERTED ACTION**

77.     In committing the wrongful acts alleged in this complaint, Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing.

78.     The purpose and effect of Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to:  (a) use, occupy, and profit from the subsurface real property owned by Plaintiff and the Class members; (b) conceal from Plaintiff and the Class members the facts regarding the presence of the pipeline on their real property; and (c) misrepresent the facts regarding the nature of Defendants' supposed legal rights to use, occupy, or profit from the subsurface of the railroad's rights-of-way.

79.     Defendants accomplished their conspiracy, common enterprise, or common course of conduct by entering into agreements with each other for the rental of portions of the subsurface under the railroad's rights-of-way and for the use, occupation, and profit from the same.

CLASS ACTION COMPLAINT

80.     Each of the Defendants aided and abetted and rendered substantial assistance in the wrongs complained of in this complaint.   In taking such actions to substantially assist the commissions of the wrongdoing complained of in this complaint, each Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of its overall contribution to and furtherance of the wrongdoing.

## CLASS ACTION ALLEGATIONS

81.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of a class consisting of all landowners in Nevada who own, in fee simple, land adjacent to and underlying a railroad easement under which the pipeline owned by the Pipeline Entities is located (the "Class").   Excluded from the Class are Defendants and their families, the federal and state governments, the officers, directors, and affiliates of Defendants, members of their immediate families, and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

82.     The Class is so numerous that joinder of all members is impracticable.   While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are thousands of members in the Class.

83.     Prospective Class members can be identified from Defendants' own records and by a search of the records of the Tax Assessor and Recorder of Deeds in a county-by-county search in the State of Nevada.   The putative class will consist of hundreds or thousands of parcels and owners along the right-of-way and pipeline, including present and past owners who have sustained damages as a result of Defendants' unlawful conduct.

84.     Plaintiff's claims are typical of the claims of the members of the Class.   The questions of law and fact common to the Class predominate over questions affecting only individual class members.   These questions include, but are not limited to:

a.     Whether Union Pacific, in possession of merely a surface easement pursuant

16

CLASS ACTION COMPLAINT

to Congressional land grants, and/or in situations where Union Pacific's easement had been rescinded, improperly and illegally purported to grant subsurface easements for a pipeline without obtaining consent from Plaintiff and the Class members and without payment to Plaintiff and the Class members.

b.      Whether Union Pacific improperly and illegally collected rents from the Pipeline Entities for the right to transmit petroleum products through the Plaintiff's and the Class members' real property located in the subsurface beneath the railroad's surface right-of-way.

c.      Whether Union Pacific's activities, specifically using or permitting the Pipeline Entities to use the limited railroad purpose right-of-way to carry petroleum through a subsurface pipe, was an improper and illegal use outside the scope of Union Pacific's easement which terminated Union Pacific's easement or whether such pipeline activity may be severed from the railroad use and itself terminated.

d.      Whether the Pipeline Entities improperly and illegally occupied the subsurface of Plaintiff's and the Class members' real property and transmitted petroleum products through Plaintiff's and the Class members' real property.

e.      Whether Defendants conspired with one another to deprive Plaintiff and the Class of their property rights.

f.      Whether the Class is entitled to declaratory relief.

g.      Whether the Class is entitled to damages for trespass.

h.      Whether the Class is entitled to quiet their title in the real property, free and clear of any claim of right by Defendants.

i.      Whether the Class is entitled to eject Defendants from the Class members' real property.

j.      Whether the Class is entitled to restitution and disgorgement of benefits unjustly obtained and retained by Defendants.

k.      Whether the Class is entitled to recover reasonable attorneys' fees, prejudgment interest, and the costs of suit.

CLASS ACTION COMPLAINT

85.     The claims of the named Plaintiff are typical of the claims of the proposed Class. The claims of the named Plaintiff, as well as the claims of the proposed Class members, arise from the same set of facts and are premised upon the same legal theories under federal law, namely the scope of Congressional land grants, and Nevada property law.  The named Plaintiff and the proposed Class members possess the same interests and they have suffered the same or similar injury – deprivation of their property rights. Further, the named Plaintiff and the proposed Class members seek the same remedy – compensation for damages for the diminution in value in their property rights and for recovery of benefits that have been unjustly obtained by Defendants from Plaintiff and the Class members.

86.     Plaintiff, as the representative party, will fairly and adequately protect the interests of the proposed Class.  Plaintiff has engaged competent and experienced counsel who will properly protect and advance the interests of the Class.

87.     A class action is superior to any other available method for the fair and efficient adjudication of this controversy.  Plaintiff and the Class members have suffered irreparable harm as a result of Defendants' unfair and unlawful conduct.  Because of the size of the individual Class members' claims, few Class members could afford to seek legal redress for the wrongs claimed herein.  Absent a class action, the Class members will continue to suffer losses and the violations of law described herein will continue without remedy and Defendants will be permitted to retain the proceeds of their misdeeds.

88.     Further, the prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class which could establish incompatible standards of conduct for Defendants or adjudication of individual claims would be dispositive of the claims of other Class members not parties to this lawsuit and could substantially impair or impede their ability to protect their interests.

CLASS ACTION COMPLAINT

# CAUSES OF ACTION

## FIRST CAUSE OF ACTION
### DECLARATORY JUDGMENT
**(Against all Defendants)**

89.     Plaintiff incorporates by reference each and every preceding allegation.

90.     An actual dispute and controversy presently exists between Plaintiff and Defendants concerning their respective rights and duties to real property situated in the subsurface beneath the railroad's right-of-way.

91.     Union Pacific contends that it holds sufficient legal right and title to purportedly grant easements to third parties, including the Pipeline Entities, to occupy the subsurface of the right-of-way, and to collect rents from such occupancy.

92.     The Pipeline Entities occupy the subsurface of the right-of-way, and derive a commercial benefit from said occupancy, without the consent of Plaintiff and the Class and without payment of rents to Plaintiff and the Class.

93.     A judicial determination of the rights and responsibilities of the parties over the real property in question is necessary and appropriate at this time.

## SECOND CAUSE OF ACTION
### TRESPASS
**(Against all Defendants)**

94.     Plaintiff incorporates by reference each and every preceding allegation.

95.     Union Pacific, by and through various Congressional land acts, acquired a surface easement and right-of-way solely for its railroad purposes.

96.     Union Pacific did not, by virtue of the Congressional land acts, acquire a fee simple interest in the subsurface below its surface right-of-way.

97.     Although Union Pacific acquired solely a surface easement for its railroad purposes only, Union Pacific purported to grant easements to the Pipeline Entities for the construction of the pipeline in the subsurface of Union Pacific's right-of-way. In addition, in some instances, Union Pacific granted easements to the Pipeline Entities even after Union Pacific's easements lapsed or were rescinded due to non-use or due to use inconsistent with the limitations imposed in the original and grants from the U.S.

19

1   government.

2       98.    Union Pacific's intentional invasion of Plaintiff's interest in the exclusive

3   possession of his subsurface rights in his property is an intentional act of trespass.

4       99.    Union Pacific's continuing claim to possess the authority to grant easements

5   in the subsurface underlying its right-of-way, to the Pipeline Entities and to others, is an

6   ongoing invasion of Plaintiff's fee ownership of the land without authority or permission

7   and amounts to a continuing trespass on Plaintiff's fee ownership in his land.

8       100.   The Pipeline Entities constructed, operated, and still transport petroleum

9   products through their pipeline beneath the subsurface of Union Pacific's right-of-way,

10  which is actually owned by Plaintiff and the Class members.

11      101.   Because Union Pacific did not own or acquire Plaintiff's fee ownership

12  interest in the right-of-way, including Plaintiff's ownership in the subsurface of the right-

13  of-way, and because Union Pacific had no authority to violate Plaintiff's fee ownership by

14  purportedly granting easements to the Pipeline Entities, the Pipeline Entities' transmission

15  of petroleum products through their pipeline is an intended invasion of Plaintiff's fee

16  ownership interest in the exclusive possession of his property.

17      102.   The Pipeline Entities' intentional invasion of Plaintiff's interest in the

18  exclusive possession of his subsurface rights in his property is an intentional act of trespass.

19      103.   The Pipeline Entities' transmission of petroleum products through the

20  pipeline is an ongoing invasion of Plaintiff's fee ownership of the land without authority or

21  permission and amounts to a continuing trespass on Plaintiff's fee ownership in his land.

22      104.   Defendants' trespass is continuing and should be abated.

23      105.   Additionally, or alternatively, Defendants' trespass is permanent, and has

24  resulted in diminution of the value of Plaintiff's real property.

25      106.   Due to Defendants' trespass, Plaintiff has suffered damages, including the

26  invasion of his exclusive rights to possess and occupy his subsurface property.

27      107.   Defendants' trespass is and was malicious, wanton, oppressive, and/or

28  fraudulent in nature.

CLASS ACTION COMPLAINT

108.   Plaintiff prays for an award of damages due to Defendants' trespass since the 1950s and for continuing trespass and for the diminution in value of his property.

**THIRD CAUSE OF ACTION**
**EJECTMENT**
**(Against all Defendants)**

109.   Plaintiff incorporates by reference each and every preceding allegation.

110.   This is an action to recover possession of real property located in Nevada.

111.   Plaintiff is the fee title holder of Union Pacific's railroad right-of-way, including the subsurface of the right-of-way.  Plaintiff's fee simple ownership is burdened only by a limited easement for the use of the surface for railroad purposes only.

112.   Union Pacific's act of using or permitting the Pipeline Entities to use the limited railroad purpose right-of-way to carry petroleum through a subsurface pipe was an improper and illegal use outside the scope of Union Pacific's easement, which terminated Union Pacific's easement.

113.   The Pipeline Entities' use of the subsurface of the right-of-way to convey petroleum products may be severed from the railroad use and terminated.

114.   As the fee title holder of the subsurface, Plaintiff has the exclusive right to possession of the subsurface of the right-of-way.

115.   Defendants have unlawfully occupied and are in possession of the subsurface beneath the railroad's right-of-way, without the consent of Plaintiff.

116.   Defendants have failed and refused to cease their occupation of Plaintiff's property.

117.   Plaintiff has sustained damages as a direct and proximate result of Defendants' wrongful occupation of the subsurface of the railroad's right-of-way.

118.   Plaintiff demands judgment for possession of the property and that he be awarded the rents, profits, the reasonable cost of repair or restoration of the property to its original condition, and other damages due to Defendants' unlawful possession of the property.

## FOURTH CAUSE OF ACTION
## QUIET TITLE
### (Against all Defendants)

119.    Plaintiff incorporates by reference each and every preceding allegation.

120.    Plaintiff is the fee title holder of Union Pacific's railroad right-of-way, including the subsurface of the right-of-way.  Plaintiff's fee ownership is burdened only by a limited easement for the use of the surface for railroad purposes only.

121.    As the fee title holder of the subsurface, Plaintiff has the exclusive right to possession of the subsurface of the right-of-way.

122.    Defendants have unlawfully occupied and are in possession of the subsurface beneath the railroad's right-of-way, without the consent of the Plaintiff.

123.    Defendants have asserted purported legal claim and title to occupy, use, and possess the subsurface of the right-of-way.

124.    Union Pacific has asserted purported legal claim and title to grant easements in the subsurface of the right-of-way and to charge and collect rents from third parties, including the Pipeline Entities, for occupation, use, and possession of the subsurface of the right-of-way.

125.    The Pipeline Entities have asserted purported legal claim and right to use the subsurface to transmit petroleum products through an unlawfully constructed and maintained pipeline located within Plaintiff's property.

126.    Defendants' claimed rights in the subsurface of the right-of-way are adverse to those of Plaintiff and threaten Plaintiff's quiet use and enjoyment of his fee interest in his real property.

127.    The claims of Defendants, and each of them, are without merit and Defendants have no right, title, or interest in the above-described real property or any part thereof.

128.    The Court should quiet title in the affected real properties solely in Plaintiff's and the Class members' respective names, free and clear of any claimed interest by Defendants, and each of them.

CLASS ACTION COMPLAINT

## FIFTH CAUSE OF ACTION
## UNJUST ENRICHMENT
### (Against all Defendants)

129.   Plaintiff incorporates by reference each and every preceding allegation.

130.   Plaintiff is the fee title holder of Union Pacific's railroad right-of-way.

131.   Plaintiff's fee ownership of the right-of-way includes the subsurface and aerial rights of the right-of-way, and Plaintiff's land is now burdened with a surface railroad easement for railroad purposes only.

132.   Union Pacific negotiated with the Pipeline Entities for rent payments by the Pipeline Entities for the use of the subsurface rights-of-way.   Union Pacific realized monetary benefits and rent payments from the Pipeline Entities for those subsurface rights, without payment to Plaintiff.

133.   Union Pacific was aware that it received the benefit of the use of Plaintiff's subsurface property rights without compensating Plaintiff.

134.   Union Pacific does not own any title and does not have permission to use the subsurface or aerial rights above and below the right-of-way on the surface, but has received substantial monetary compensation and benefit without payment of just compensation to Plaintiff, such that the retention by Union Pacific of payments made by the Pipeline Entities is unfair, unjust, and inequitable.

135.   Because Union Pacific has realized enormous monetary benefit for the improper use of Plaintiff's subsurface rights in his property, Union Pacific has been unfairly and unjustly enriched and owes restitution to Plaintiff for the use and rent collected by Union Pacific for illegal and unauthorized subsurface easements granted to the Pipeline Entities.

136.   Plaintiff is entitled to damages for the value of all rents and monetary benefits received by Union Pacific for all improper and illegal easements granted to the Pipeline Entities since the 1950s.

137.   The Pipeline Entities, as successors to the original corporate affiliate of Union Pacific's predecessor, constructed a pipeline within Plaintiff's property without

CLASS ACTION COMPLAINT

notice to Plaintiff, and without negotiating or paying for the right to use the subsurface of the right-of-way.

138.   Upon information and belief, the Pipeline Entities' predecessor-in-interest would have faced substantial additional cost and delay if it had fairly negotiated with and compensated the owners of the property at issue at the time the pipeline was constructed, and unjustly, unfairly, and inequitably received the benefit of the use of the property.

139.   The Pipeline Entities, as corporate affiliates of the railroad, occupied the subsurface of the railroad's right-of-way for decades by payment of rents that were less than the fair market value that would have been charged in an arm's-length transaction.

140.   By virtue of the wrongful acts herein described, the Pipeline Entities established a considerable market share and dominance of the oil and gas market, with more than 50% of their pipeline in the Western and Southwestern United States passing within Union Pacific's right-of-way.

141.   The Pipeline Entities realized enormous cost savings and profits derived from operating the pipeline through this territory without payment of just compensation to the property owners – *i.e.*, Plaintiff and the Class members.

142.   The Pipeline Entities have enjoyed an unjust and unfair competitive advantage over other pipeline companies who properly paid for and secured the right to build their pipelines.

143.   The Pipeline Entities are aware of the benefits they have received from and at the expense of Plaintiff and the Class members.

144.   Because the Pipeline Entities have realized enormous monetary benefit for the improper use of Plaintiff's and the Class members' subsurface rights in their property, the Pipeline Entities have been unfairly and unjustly enriched and owe restitution to Plaintiff and the Class members for the use and rent of Plaintiff's and the Class members' real property.

145.   Plaintiff and the Class members are entitled to damages for the value of all monetary benefits received by the Pipeline Entities for their improper and illegal

1    occupation and use of the subsurface of the rights-of-way since the 1950s.

2         146.    Plaintiff lacks an adequate remedy at law.

3         147.    Defendants' conduct is and was malicious, wanton, oppressive, and/or

4    fraudulent in nature.

5         148.    Plaintiff prays for recovery of benefits that were unjustly obtained and

6    retained by Defendants, for a constructive trust in favor of Plaintiff to be placed upon the

7    benefits and proceeds received by Defendants as a result of their violation of the Plaintiff's

8    rights.

9                              **SIXTH CAUSE OF ACTION**
                                    **ACCOUNTING**
10                              **(Against all Defendants)**

11        149.    Plaintiff incorporates by reference each and every preceding allegation.

12        150.    As set forth above, Defendants have received unlawful benefits from

13   Plaintiff.

14        151.    Plaintiff is entitled to an accounting from Defendants of these benefits and

15   profits.

16        152.    Plaintiff lacks an adequate remedy at law.

17        153.    Plaintiff prays for an accounting by Defendants of benefits and profits that

18   were unfairly and/or unlawfully obtained from Plaintiff by Defendants.

19                           **SEVENTH CAUSE OF ACTION**
                                  **CIVIL CONSPIRACY**
20                              **(Against all Defendants)**

21        154.    Plaintiff incorporates by reference each and every preceding allegation.

22        155.    By and through the wrongful acts described in this complaint, Defendants,

23   and each of them, have combined, associated, agreed, conspired, mutually undertaken, and

24   concerted together for the purpose of injuring Plaintiff and the Class.

25        156.    By and through the wrongful acts described in this complaint, Defendants,

26   and each of them, have attempted to procure the participation, cooperation, agreement, or

27   other assistance of other persons to enter into a combination, association, agreement,

28   mutual understanding, or concert for the purpose of injuring Plaintiff and the Class.

CLASS ACTION COMPLAINT

157.    By and through the wrongful acts described in this complaint, Defendants, and each of them, have combined, associated, agreed, conspired, mutually undertaken, and concerted together for the purpose of intentionally invading Plaintiff's and the Class members' interests in the exclusive possession of their subsurface rights in their property in an intentional act of trespass.

158.    Defendants' acts complained of in this count have been undertaken in order to serve Defendants' personal pecuniary interests, including, in Union Pacific's case, collecting rent from the Pipeline Entities that it had no right to collect, and, in the Pipeline Entities' case, developing a commanding share of the oil and gas market through the use and occupancy of the pipeline without the consent of Plaintiff and the Class and without compensation to them.

159.    Defendants' acts complained of in this count have been undertaken without justification.

160.    Plaintiff and the Class have been injured as a direct and proximate result of the acts complained of herein, and have suffered damages in an amount to be determined at trial.

## DEMAND FOR TRIAL BY JURY

Plaintiff demands a trial by jury with respect to all claims so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, and on behalf of the general public, prays for judgment against Defendants as follows:

A.    For an order certifying this class as a class action and appointing Plaintiff and Plaintiff's counsel to represent the Class;

B.    For a declaration that (1) Defendant Union Pacific lacks sufficient legal right or title in the subsurface of its right-of-way to grant easements or to collect rents associated with the occupancy of the subsurface, and (2) Defendant Pipeline Entities lack sufficient legal right or title to occupy the subsurface of the railroad's right-of-way;

C.    For an award of damages, restitution, and/or disgorgement of benefits or

1    profits according to proof;

2         D.      For an award of exemplary damages based on the second cause of action for

3    trespass and the fifth cause of action for unjust enrichment;

4         E.      For possession of the subsurface real property;

5         F.      For an order quieting title in the subsurface real property in Plaintiff's and

6    the Class members' respective names, free and clear of any claimed interest by Defendants;

7         G.      For a constructive trust in favor of Plaintiff to be placed upon the benefits

8    and proceeds received by the Defendants;

9         H.      For an accounting by Defendants of all benefits and profits that were

10   unfairly and/or unlawfully obtained from Plaintiff and the Class members by Defendants;

11        I.      For reasonable attorneys' fees;

12        J.      For pre-judgment interest;

13        K.      For costs of suit; and

14        L.      For such other and further relief as this Court deems just and proper.

15   Dated:  September 18, 2015          Respectfully submitted,

16                                       THE O'MARA LAW FIRM, P.C.
17                                       David C. O'Mara

18                                       /s/ David C. O'Mara
                                               David C. O'Mara
19
                                         311 East Liberty Street
20                                       Reno, Nevada  89501
                                         Telephone:     (775) 323-1321
21                                       Facsimile:     (775) 323-4082

22                                       *Liaison Counsel for Plaintiff*

23                                       BOTTINI & BOTTINI, INC.
                                         Francis A. Bottini, Jr.
24                                       Albert Y. Chang
                                         Yury A. Kolesnikov
25                                       7817 Ivanhoe Avenue, Suite 102
                                         La Jolla, California  92037
26                                       Telephone:     (858) 914-2001
                                         Facsimile:     (858) 914-2002
27
                                         *Attorneys for Plaintiff*
28

---

27

CLASS ACTION COMPLAINT